**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABSOLUTE USA, INC., et al., | Case No.:  2:21-cv-06410-MEMF(MAAx) |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE [ECF NO. 34] AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS [ECF NO. 32, 34, 35]** |
| HARMAN PROFESSIONAL, INC., et al., | |
| Defendants. | |

Before the Court is the Motion to Dismiss filed by Defendants Harman Professional, Inc. and Michael A. Schoen. ECF No. 32. For the reasons stated herein, the Motion to Dismiss is GRANTED IN PART. Also before the Court is the Request for Judicial Notice filed by Plaintiffs Absolute USA, Inc. and Mohammad Razipour. ECF No. 34–1. For the reasons stated herein, the Request is GRANTED.

/ / /

/ / /

1

I.     **Factual Background**[1]

Plaintiff Absolute USA, Inc. ("Absolute") is a California corporation headed by its president and sole beneficiary, Plaintiff Mohammad Razipour ("Razipour"). SAC ¶¶ 1–2, 10. Defendant Harman Professional Solutions ("Harman") is a manufacturer of audio, video, lighting, and control systems for the professional market.[2] Joint Case Management Statement ("Joint CMS"), ECF No. 40 at 2. Defendant Michael A. Schoen ("Schoen") is a California resident employed by Harman. *Id.*

On or about May 28, 2015, Absolute and Harman entered into a Dealer Agreement (the "Agreement"), authorizing Absolute on a non-exclusive basis to "purchase, sell [,] and market certain Harman-approved and designated products to end users subject to the terms and conditions of the Agreement." *Id.* at 3; SAC ¶ 10. Under the terms of the Agreement, Absolute was authorized solely to sell Harman products through Internet or online sales and only by using the two websites specified in the Agreement. The Agreement, Declaration of Michael Schoen, Ex. A § 1.4.

The Agreement provides for a one-year term, starting on the designated "Effective Date" and expiring on June 30 of the "calendar year immediately following the Effective Date." Agreement § 8.1. It includes an automatic renewal for successive twelve (12)-month periods, unless "either Party notifies the other at least thirty (30) days prior to the expiration of the then-current Term, that it does not wish to further renew the Term." *Id.* Either party may terminate the Agreement for any reason "at any time" upon giving the other Party thirty days advance written notice. *Id.* § 8.2. A party may also terminate the Agreement in whole or as to a particular brand or line of products if "the other Party breaches any material obligation under [the Agreement] and fails to cure such breach within fifteen (15) days after being notified of such breach." *Id.* Upon termination or expiration of the Agreement, the "Dealer shall discontinue operating and holding itself out as an authorized dealer or reseller of Harman or its products, and permanently discontinue any and all use of the Trademarks and Proprietary Rights, including such use in advertising." *Id.* § 8.4.

---

[1] Unless otherwise indicated, the following facts are derived from the Second Amended Complaint. ("SAC"), ECF No. 30.
[2] The professional market includes "entertainment venues, cinemas, [and] recording studios." Joint CMS at 2.

The Agreement was automatically renewed for multiple successive one-year terms until March 2020 when Schoen, acting on behalf of Harman, orally terminated the Agreement. SAC ¶¶ 10–11. Contrary to the Agreement's terms, however, Absolute was not provided with any prior notice of the termination and was not given an opportunity to cure. *Id.* In the course of the termination, Schoen expressed to Absolute and Razipour that he was "happy to finally be able to terminate the Agreement" and that he had wanted to do so for some time because "all you . . . Iranians need to be terminated."[3] *Id.* ¶ 12.

## II.   Procedural Background

On May 12, 2021, Absolute filed this case in Los Angeles Superior Court alleging the following nine claims against Harman and Schoen (collectively the "Harman Defendants"): (1) fraud; (2) negligent misrepresentation; (3) race discrimination, 42 U.S.C. § 1981; (4) violation of the Unruh Civil Rights Act, CAL. CIV. CODE §§ 51–52; (5) breach of contract; (6) breach of implied-in-fact contract; (7) breach of implied covenant of good faith and fair dealing; (8) unjust enrichment; (9) unfair business practice, CAL. BUS. & PROF. CODE § 17200. ECF No. 1, Ex. 1. This action was timely removed to this Court on August 9, 2021. *Id.* On September 15, 2021, the Harman Defendants filed a Motion to Transfer this case to the Southern District of New York (ECF No. 14) and a simultaneous Motion to Dismiss the Absolute's first, second, fifth through ninth causes of action. ECF No. 15.

On October 4, 2021, Absolute and Razipour (collectively, the "Absolute Plaintiffs") filed a First Amended Complaint, adding Razipour as a plaintiff to the Section 1981 claim and the Unruh Civil Rights Act claim and adding two new causes of action by Absolute: violation of California Corporate Code § 31000 and violation of California Business and Professions Code § 20000. *See generally* First Amended Complaint, ECF No. 19 ("FAC"). The Motion to Transfer was fully briefed as of October 12, 2021. ECF No. 21; ECF No. 22. On October 12, 2021, due to the FAC, the Motion to Dismiss was denied as moot. ECF No. 22. The Motion to Transfer was denied without prejudice

---

[3] The Court notes that the Absolute Plaintiffs allege that Schoen used an expletive when referring to Iranians. As the specifics of the expletive are not relevant to the Court's decision on this motion, the Court omits it here.

for failing to present sufficient evidence for the Court to determine that the Southern District of New York is the appropriate venue. ECF No. 26.

On November 9, 2021, the Absolute Plaintiffs filed a Second Amended Complaint ("SAC"), removing the unjust enrichment claim and seeking general and special damages, exemplary damages, monetary relief, an injunction, and attorneys' fees and costs. ECF No. 30. The Harman Defendants filed a motion to dismiss Razipour as a plaintiff from the Fifth and Sixth causes of action as well as to dismiss the entirety of the First through Fourth and Seventh through Tenth causes of action. ("Motion" or "Mot."), ECF No. 32. On December 27, 2021, the Absolute Plaintiffs filed an Opposition to the Motion with an accompanying Request for Judicial Notice. Opposition, ECF No. 34 ("Opp'n"); ECF No. 34–1 ("RJN"). The Absolute Defendants filed a Reply on January 24, 2022. ECF No. 35 ("Reply"). The Court heard oral argument on June 2, 2022. In accordance with the Court's order at the hearing, on June 2, 2022, the Harman Defendants submitted supplemental briefing regarding the applicability of *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006) to Razipour's 42 U.S.C. § 1981 claim. ECF No. 44 ("Supplemental Brief" or "Suppl. Br.").

## REQUEST FOR JUDICIAL NOTICE

### I. Applicable Law

A court may take judicial notice of facts not subject to reasonable dispute where the facts "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Under this standard, courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002). The Ninth Circuit has recognized public records, including documents on file in federal court, as appropriate for judicial notice. *See, e.g.*, *Harris v. County of Orange*, 682 F.3d 1126, 1132–33 (9th Cir. 2012); *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007).

/ / /

## II.   Discussion

The Absolute Plaintiffs submit—and ask the Court to take judicial notice of—the following exhibit:

(1) Commissioner's Release 3–F: When Does an Agreement Constitute a "Franchise" (Exhibit 1) ("Release 3–F").

This exhibit is found on the website of the California Department of Financial Protection and Innovation, a state agency. Under Federal Rule of Evidence 201, a court may take judicial notice of information "made publicly available by government entities . . . and neither party disputes the authenticity of the website or the accuracy of the information displayed therein." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992–99 (9th Cir. 2010). The Harman Defendants do not dispute the authenticity of this exhibit. Accordingly, the Court takes judicial notice of this exhibit.

## MOTION TO DISMISS

## I.   Applicable Law

### A.  Rule 12(b)(6) Motion to Dismiss

Under Federal Rule of Civil Procedure Rule 12(b)(6), a party may file a motion to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The purpose of Rule 12(b)(6) is to "enable defendants to challenge the legal sufficiency of claims asserted in a complaint." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). A district court may properly dismiss a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts to support a cognizable legal theory. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than "threadbare recitals of the elements of a cause of action." *Id.* at 678. "Determining whether a complaint states a plausible

claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159; *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."). This tenet, however, is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

**B. Rule 9(b) Heightened Pleading Standard**

Fraud claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). To meet Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct, "as well as what is false or misleading about" it, and "why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted). On a motion to dismiss pursuant to Rule 12(b)(6), "claims of fraud or mistake . . . must, in addition to pleading with particularity, also plead plausible allegations. That is, the pleading must state 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged].'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

**C. Leave to Amend**

Whether to grant leave to amend is left to the district court's "sound discretion." *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996). Rule 15(b) instructs that the court should "freely give leave when justice so requires." FED. R. CIV. P. 15(b)(2); *see also Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). The Ninth Circuit has repeatedly held that this principle should be "applied with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Owens v. Kaiser Found. Health Plan*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo*, 893 F. 2d at 1079); *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

When exercising its discretion, precedent dictates that the district court should weigh various factors in its determination including undue delay, bad faith or "dilatory motive," "repeated failure to cure deficiencies by amendments previously allowed," undue prejudice to the opposing party, and "futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). While prejudice to the opposing party "carries the greatest weight," a strong showing of any of these factors may justify the denial of leave to amend. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

## II.   Discussion[4]

### A. The Agreement is governed by California law.

Before addressing the sufficiency of the SAC, the Court must determine which state's law governs the contract dispute. The Agreement contains a choice-of-law provision indicating that New York law applies.

"A federal court sitting in diversity must look to the forum state's choice-of-law rules to determine the controlling substantive law." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2011). To determine whether New York law is applicable, California courts consider: "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 466 (Cal. 1992). If neither of the two tests are met, the inquiry ends. *Id.* A substantial relationship between the choice-of-law state and the contracting parties exists if a party is domiciled in the state. *Id.* at 467. Moreover, a "reasonable basis" for following a choice-of-law provision exists if one of the parties resides in the state. *Id.*

Here, neither the Absolute Plaintiffs nor the Harman Defendants are domiciled in New York and do not appear to have any other substantial relationship to the state. SAC ¶¶ 1–4. Furthermore, the record does not provide any indication that the contract was negotiated in New York. Instead, the

---

[4] The Harman Defendants repeatedly reference the previous dismissal order (ECF No. 29) as support for the alleged insufficiency of Absolute's claims. However, the Absolute Plaintiffs' First Amended Complaint was not dismissed on the merits but was instead dismissed due to the Plaintiffs' failure to file a timely opposition to the then-operative motion to dismiss. *See* ECF No. 29. Accordingly, the previous order on the motion to dismiss is not material to the Court's analysis.

Absolute Plaintiffs state that "all the acts complained of . . . and the obligations alleged . . . were done and incurred with the County of Los Angeles, State of California." *Id.* ¶ 8. Accepting all well-pleaded allegations in favor of Plaintiffs—as this Court must—the Court finds neither a substantial relationship nor reasonable basis for the application of New York law exists. *See Caltex*, 824 F.3d at 1159. Accordingly, the Court applies California law.

### B. The Absolute Plaintiffs have not sufficiently established the existence of a franchisor-franchisee relationship.

The Harman Defendants seek dismissal of the Absolute Plaintiffs' first cause of action for violation of the California Franchise Relations Act, Cal. Corp. Code § 31000, *et seq.* ("CFRA") and second cause of action for violation of the California Franchise Investment Law, Cal. Bus. & Prof. Code § 20000, *et seq.* ("CFIL"). *See* Mot. at 7 – 9. While disparate statutes with different functions, the CFIL and CFRA are similar in that they both only apply in the context of a franchisor-franchisee relationship. Indeed, the CFIL "protects consumers in the sale of franchises" while the CFRA applies after the sale and "regulates certain events after the franchise relationship has been formed." *Gentis v. Safeguard Bus. Sys., Inc.*, 60 Cal. App. 4th 1294, 1298, 71 Cal. Rptr. 2d 122, 123 (1998). Thus, before the Court can consider the merits of the Harman Defendants' arguments, it must first consider whether a franchise relationship existed between the parties.

The definition of a franchise is identical under the CFIL and CFRA. Under both statutes, "a franchise is a contract or agreement, either express or implied, whether oral or written, by which (1) a franchisee is granted the right to engage in a marketing system substantially prescribed by the franchisor; (2) the business is substantially associated with the franchisor's trademark or other commercial symbol; and (3) the franchisee is required to pay a franchise fee." *Thueson v. U-Haul Int'l, Inc.*, 144 Cal. App. 4th 664, 670 (Ct. App. 2006); CAL. CORP. CODE § 31005(a)(1)–(3). "[F]ailure to satisfy any statutory element of the franchise definition is fatal" to this claim. *Id.* at 670. The Court now turns to addressing the sufficiency of the SAC as to each element.

/ / /

/ / /

i.  The Absolute Plaintiffs have not pleaded sufficient facts alleging the presence of a
    franchisor-franchisee relationship.

The Harman Defendants argue that the Absolute Plaintiffs have failed to allege sufficient facts establishing the presence of a franchise contract. Mot. at 9. Specifically, the Harman Defendants contend that: the Absolute Plaintiffs have failed to show that the Agreement contains a provision requiring payment of a franchise fee; the terms of the Agreement are "narrowly tailored to retail distribution only" and lack "language suggesting any franchise appointment;" and when Absolute entered into the Agreement "it expressly agreed that: 'Nothing stated in this agreement shall be construed as creating the relationship of . . . franchisor and franchisee.'" *Id.* at 9–11. In response, the Absolute Plaintiffs maintain that considering the Agreement in conjunction with "surrounding evidence" indicates that a franchise relationship existed between the two parties. Opp'n at 7.

a.  The SAC does not allege the existence of a marketing plan.

The first element of the test—the existence of a marketing system or "marketing plan"—requires that there be "a contract or agreement, either express or implied, whether oral or written, between two or more persons by which a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor." Cal. Corp. Code § 31005(a)(1); *People v. Kline*, 110 Cal. App. 3d 587, 593–94 (Ct. App. 1980). Marketing plans may be prescribed expressly, in part, or by implication. Release 3–F § 2(1)–(5). When evaluating whether a marketing plan exists, a court must simultaneously "keep in mind the objective of the Law to deal with a multiplicity of business arrangements created by the franchisor and presented to the public as a unit or marketing concept" with the goal of creating the appearance of a "centralized management and uniform standards regarding the quality and price of goods sold, services rendered, and other material incidents of the operation." Release 3–F § 2(2)(2). A franchisor's creation of such standards can include prescribing or limiting resale prices, setting restrictions on use of advertising, providing trade secrets, and assigning the use of a manual, among others. *Id.* § 2(2)(7). However, a marketing plan is not found if

"the distributor or retailer may sell the product according to its own plan without express or implied limitations on the method or mode of sale." *Id.* § 2(2)(1).

The SAC contains the following allegations in support of this element:

28. HARMAN is a multi-billion dollar company and is a party to thousands, if not more, similar dealer agreements with other companies. HARMAN has established and enforced an elaborate and detailed marketing system centered around the HARMAN trademarks, and the Dealer Agreements authorize companies to advertise HARMAN products using the HARMAN trademarks. Throughout all applicable time periods, HARMAN has controlled and dictated the terms upon which companies may market HARMAN products and use the HARMAN trademarks, through a marketing system prescribed and enforced by HARMAN.
43. Absolute was granted the right to engage in the business of offering, selling and distributing HARMAN branded . . . goods and services through the AGREEMENT. Paragraph 1.1 of the AGREEMENT specifically provided that ABSOLUTE had the right "to purchase, sell and market certain Harman-approved and designated products . . . to end-users . . . ."

SAC ¶¶ 28, 43.

However, *Iqbal* requires that a complaint "contain sufficient factual matter . . . to state a claim for relief that is plausible on its face." 556 U.S. at 678 (internal quotations omitted). The SAC's allegations do not contain any facts demonstrating how Harman "centralized management and uniform standards regarding the quality and price of goods sold, services rendered, and other material incidents of the operation" or specifically how Harman "has controlled and dictated the terms upon which companies may market" its products and trademarks. Release 3–F 2(2)(2); SAC ¶ 28. Further, while the Absolute Plaintiffs argue in the Opposition that Harman "controlled and dictated the terms upon which companies may market HARMAN products and use the HARMAN trademarks, through a marketing system prescribed and enforced by HARMAN," the SAC fails to provide any detail describing Harman's particular requirements or processes, let alone outline the elements of the alleged marketing system. Opp'n at 8.

An examination of the Agreement's text is not any more availing. The text of the Agreement does not provide any specific directives establishing "centralized management and uniform standards regarding the quality and price of goods sold." Release 3–F § 2(2)(2). Instead, the Agreement only provides the non-specific guidance that "the Dealer shall use its best efforts to

1  actively market and sell the Products by all usual and ethical means and promote the goodwill and

2  name of Harman's brands and Products." Agreement § 2.1.

3       Thus, in the absence of more detail, the Court finds that the Absolute Plaintiffs' allegations

4  are merely "legal conclusions." *Iqbal*, 556 U.S. at 678. Accordingly, the Court finds that the

5  Absolute Plaintiffs have failed to establish the existence of a marketing plan. While the failure to

6  establish the existence of a marketing plan is fatal to the franchisor inquiry, and thus sufficient to

7  dismiss the Absolute Plaintiffs' CFIL and CFRA claims, the Court, for the sake of completeness,

8  evaluates the remaining two elements.

9         b.  The Absolute Plaintiffs have sufficiently established that Absolute is substantially

10  associated with the franchisor's trademark or other commercial symbol.

11       Turning next to the second element, whether a business is associated with the franchisor's

12  trademark or other commercial symbol, the Absolute Plaintiffs must establish that "[t]he operation of

13  the franchisee's business pursuant to that plan or system is substantially associated with the

14  franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol

15  designating the franchisor or its affiliate." Cal. Bus. & Prof. Code § 20001(b). "[I]f the franchisee is

16  granted the right to use the franchisor's symbol, [this] part of the franchise definition is satisfied

17  even if the franchisee is not obligated to display the symbol." Release 3–F § 3. However, "for the

18  operation of the franchisee's business to be substantially associated with the symbol, it must be

19  communicated to the customers of the franchise." *Id.* The dealer must be permitted to display the

20  symbol to its customers such that "in the eyes of the public" the dealer is considered to be

21  substantially associated with the operation of the supplier. *Id.*

22       Upon review of the Motion, it appears that the Harman Defendants merge the second and

23  third[5] prongs of the franchise test. *See* Mot. at 10. They argue that the Absolute Plaintiffs have not

24  satisfied either prong because "there is nothing in the Dealer Agreement concerning any fee for

25  Absolute's use of HARMAN trademarks." Mot. at 10. In response, the Absolute Plaintiffs argue that

26

27  ─────────────────

28  [5] As discussed *infra* Section B.i.c, the Court finds that the Absolute Plaintiffs have failed to meet the requirements of the third element of the franchise test.

the Agreement granted them "the right to use certain 'HARMAN' trademarks" and that the plaintiffs "did in fact use them in connection with their business for almost five (5) years." Opp'n at 9.

The SAC alleges that the Harman Defendants "are the owners of several HARMAN trademarks that are substantially associated with the HARMAN franchise business including" several federally registered trademarks for "the names and logos of 'HARMAN.'" Opp'n at 8; SAC ¶ 30. Absolute further contends that the Harman Defendants "expressly granted ABSOLUTE the right to use the Harman trademarks associated with their franchise business in the AGREEMENT." SAC ¶ 32. The Agreement supports this argument. Section 7.1 grants the dealer the ability to use and display trademarks and designations owned by Harman and its affiliates in connection "with selling, advertising, and promoting" the sale of Harman products. Agreement § 7.1. In full, it provides

> During the term of this Agreement, Dealer may display such trademarks, trade names, and designations owned by Harman or its Affiliates ("Trademarks") that are directly associated with the Products that Dealer is authorized to purchase and sell, solely for the purposes of, and in connection with, selling, advertising, and promoting the sale of the Products.

*Id.*

The Harman Defendants argue that while  the Agreement authorizes the use of the Harman trademarks, Section 7.1 only "authorizes a limited display of HARMAN trademarks that are directly associated with the Products that Dealer is authorized to purchase and sell, solely for the purposes of, and in connection with, selling, advertising, and promoting the sale of the Products." Mot. at 10. However, the second prong of the franchise definition is satisfied simply "if the franchisee is *granted the right* to use the franchisor's symbol." *Thueson*, 144 Cal. App. 4th at 670 (emphasis added). As the Agreement grants the Absolute Plaintiffs with this ability, the Court finds that Absolute is "substantially associated with the franchisor's trademark." *Id.*

          c.   <u>The SAC fails to allege that the Absolute Plaintiffs were required to pay a franchise fee.</u>

The third and final prong requires that the Court analyze whether the Absolute Plaintiffs were required to pay a franchise fee. *Thueson*, 144 Cal. App. 4th at 670–71 (citing Cal. Corp. Code § 31011; Cal. Bus. & Prof. Code § 20007). A franchise fee is "any fee or charge that a franchisee or

subfranchisor is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including, but not limited to, any payment for goods and services." *Id.* The fee may be direct, expressly prescribed by the contract, or indirect— "imposed upon the purchaser to purchase or pay for a quantity of the goods in excess of that which a reasonable businessperson normally would purchase by way of starting inventory or supply or to maintain a going inventory or supply." *Id.* (citing Cal. Corp. Code § 31011). "[A]ny fee or charge which the franchisee is required to pay to the franchisor or an affiliate of the franchisor for the right to engage in business is a franchise fee regardless of the designation given to, or the form of, such payment." Release 3–F. "Whether or not a fee or charge is 'required' and whether it is made 'for the right to enter into a business,' is a mixed question of fact and law." *Thueson*, 144 Cal. App. 4th at 671–72. California appellate courts have interpreted the legislative intent behind the CFIL and CFRA as to "protect[] . . . investors who assume significant financial risk by making a personally significant monetary investment upon entering into a franchise." *Thueson*, 144 Cal. Rptr. 3d at 674. "Our statutes define a franchise fee as a fee paid for the right to do business, not ordinary business expenses paid during the course of business." *Id.* at 669.

The Harman Defendants maintain that the Absolute Plaintiffs have not met this prong because there is "nothing in the Dealer Agreement concerning any fee for Absolute's use of HARMAN trademarks." Mot. at 10. However, in support of the franchise fee prong, the Absolute Plaintiffs allege that

> 25. Franchisor HARMAN required payment of fees that constituted a franchise fee by ABSOLUTE and ABSOLUTE paid franchise fees to HARMAN and its associates. The franchise fees paid by ABSOLUTE within the statutes of limitations period were paid based on gross receipts and units of Harman products sold. These payments included HARMAN requiring ABSOLUTE to pay for displays and trade show fixtures, printing and distribution of HARMAN labeled catalogues and HARMAN's advertising. Additionally, HARMAN required ABSOLUTE to purchase and pay for fixtures, equipment and other articles which were required to be utilized in the operation of the franchised business such as display cases, tools [,] and equipment, at a cost of more than $1,000. Some of these payments were required to be paid by ABSOLUTE for the account of HARMAN, though not directly to HARMAN.

> 26. In addition to the above, Plaintiff is informed and believes that HARMAN sold products to ABSOLUTE for a price in excess of the bona fide wholesale price for the goods, thereby constituting an additional franchise fee.

32. From approximately May 28, 2015, through March 10, 2020, ABSOLUTE has been operating retail stores, in person and online, and selling HARMAN product as franchisees of the HARMAN Franchise. ABSOLUTE paid to HARMAN a licensing fee to advertise HARMAN products by using the HARMAN trademarks.

SAC ¶ 32. *See also* Opp'n at 8 ("Plaintiff ABSOLUTE has paid hundreds for the use of the HARMAN trademarks in advertising.").

Although the Harman Defendants argue that the Agreement does not explicitly prescribe a franchise fee, this fact is not dispositive. *See* Release 3–F §4(1) ("[A]ny fee or charge which the franchisee is required to pay to the franchisor or an affiliate of the franchisor for the right to engage in business is a franchise fee."). Instead, where the SAC falls short is in its failure to allege that the "excess of $1000.00" the Absolute Plaintiffs paid for "the use of the HARMAN trademarks in advertising products for resale," SAC ¶ 28, is "a fee paid for *the right to do business*" and "not ordinary business expenses paid during the course of business." *Thueson*, 144 Cal. App. 4th at 676 (emphasis added).

There is no indication that the Absolute Plaintiffs' expenses were non-recoverable or were anything more than incidental business fees. Indeed, as currently pleaded, the alleged payments only appear to have been made after the Absolute Plaintiffs had entered business with Harman and allowed the Absolute Plaintiffs to conduct subsequent business with third-parties, rather than as an entry fee to create the initial relationship between the parties.[6]

The SAC further directs the Court to guidance from the California Commissioner of Corporations which indicates that the following fees qualify as a franchise fee:

a. An initial or set-up fee . . .;
b. Fee for advertising . . . ;
c. A payment for training and school expenses . . .;
d. Royalty or percentage of gross receipts . . .;

---

[6] *See, e.g.*, *Adees Corp. v. Avis Rent A Car Sys., Inc.*, 157 Fed. App'x 2, 3 (9th Cir. 2005) (unpublished) (where a fleet surcharge did not qualify as a franchise fee because plaintiff "received something of value in exchange for the fleet surcharge . . . ." and where a refueling surcharge similarly was not found to be a franchise fee because it was "part and parcel of the entire income stream related to the business of renting cars, a business made possible in this case because of" the original agreement between the parties).

e. Charges for sales kits, brochures, programs, forms, decals, shirts, displays and announcements . . .;

f. Payment for services, such as consulting or management fees . . . .

SAC ¶ 27. The Absolute Plaintiffs go on to argue that they are "informed and believe[] that all of these types of fees were imposed by HARMAN and existed within the HARMAN system." *Id.* However, the Absolute Plaintiffs provide no factual allegations detailing which or how any of the alleged fees qualify as those enumerated in this list. And while a Rule 12(b)(6) motion to dismiss requires the Court to "accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff," *Caltex*, 824 F.3d at 1159, this requirement is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. As the SAC simply states that the "all [relevant] types of fees were imposed by" and existed within the Harman Defendants' system, the Court finds the Absolute Plaintiffs' allegations conclusory and insufficient on a motion to dismiss.

Thus, the Court finds that the SAC fails to allege sufficient facts to satisfy the third prong of the franchise test.

As stated, failure of one element of the franchise test is "fatal" to the whole of the inquiry. As the Court has determined that the SAC fails to adequately plead two elements, it is clear that the Absolute Plaintiffs have failed to establish the existence of a franchisor-franchisee relationship. *See Thueson*, 144 Cal. App. 4th at 670. As the Absolute Plaintiffs' CFRA and CFIL claims are dependent on the existence of such a relationship, the Court finds that the Absolute Plaintiffs' first cause of action for violation of the CFIL and second cause of action for violation of the CFRA must be dismissed. Accordingly, the Court GRANTS Harman's Motion to Dismiss as to Absolute's second cause of action with leave to amend. As discussed in more detail *infra* Section C, the Absolute Plaintiffs' first cause of action for violation of the CFIL is DISMISSED WITHOUT LEAVE TO AMEND.

**C. The Absolute Plaintiffs' CFIL claim is time-barred.**

The Harman Defendants seek to dismiss the Absolute Plaintiffs' first cause of action for violation of the CFIL on three grounds. First, the Harman Defendants argue that the claim should be dismissed because as the "only violation of the CFIL identified and asserted by Plaintiffs is a purported offer and sale of a franchise to Absolute by HARMAN without first registering the offer

as required by Cal. Corp. Code § 31101," the claim is time-barred under the statute. Mot. at 7–8. Second, the Harman Defendants contend that the Absolute Plaintiffs "fail to allege how the alleged violation of the CFIL—offering and selling a franchise without registering the offer of franchise . . . caused any harm." *Id.* at 8. Finally, the Harman Defendants argue that "Plaintiffs fail to sufficiently allege the existence of a franchise." *Id.* at 9.

As discussed above, the Absolute Plaintiffs have failed to establish the existence of a franchise relationship. This alone is sufficient to dismiss the CFIL claim. However, the CFIL includes a statute of limitations provision restricting the commencement of civil enforcement actions. It provides

> No action shall be maintained to enforce any liability created under Section 31300 unless brought before the expiration of *four years after the act or transaction constituting the violation*, the *expiration of one year after the discovery by the plaintiff of the fact constituting the violation*, or 90 days after delivery to the franchisee of a written notice disclosing any violation of Section 31110 or 31200, which notice shall be approved as to form by the commissioner, whichever shall first expire.

CAL. CORP. CODE § 31303 (emphasis added).

When determining which statute of limitations should apply, California law dictates that a court must "identify the nature of the cause of action, i.e., the 'gravamen' of the cause of action." *Marin Healthcare Dist. v. Sutter Health*, 103 Cal. App. 4th 861, 874–75 (Ct. App. 2002). "The nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code." *Id.*

Here, the Harman Defendants argue that the Absolute Plaintiffs' CFIL claim is time-barred as the gravamen of the CFIL claim is based on the Harman Defendants' failure to properly register as a franchise as required by California Corporations Code § 31101. Mot. at 8. However, the Absolute Plaintiffs argue that the Harman Defendants' conduct from the initial signing of the contract in May 2015 until the Agreement's termination on March 10, 2020, constitutes a "continuing violation of the California franchise laws." Opp'n at 7–8.

/ / /

/ / /

16

1    To support the CFIL claim, the Absolute Plaintiffs allege the following facts:

2    39. Defendant HARMAN herein offered and sold Plaintiffs a franchise in the state of
3    California, in which Plaintiffs were (1) granted the right to engage in the HARMAN
     marketing system; (2) in a business substantially associated with "HARMAN"
4    trademark; and 93) Plaintiffs, directly and indirectly paid a fee, all done by HARMAN
     *without HARMAN first registering the offer of the franchise under Corp Code 31000*
5    *et seq.*
     [ . . .]
6    42. Defendant HARMAN herein has [met the four elements required for an agreement
7    to constitute a franchise] and therefore offered and sold Plaintiffs a franchise in the
     state of California within the statute of limitations, all done by *HARMAN without*
8    *HARMAN first registering the offer of the franchise under Corp. Code 31000*, et seq.
     Additionally, HARMAN's conduct throughout constitutes a continuing violation of
9    California franchise laws through and including March 10, 2020.

10   SAC ¶¶ 39, 42 (emphasis added).

11       The SAC indicates that the Absolute Plaintiffs rest their CFIL claim on Harman's failure to

12   register the Agreement as a franchise. Coupled with the legislative intent of the CFIL—to allow

13   potential franchisees to make an "intelligent decision regarding franchises being offered"— it

14   follows that the gravamen of a CFIL claim rests on the initial moment of contracting and not on

15   subsequent or automatic renewals. *See* CAL. CORP. CODE § 31001. As the parties entered into the

16   Agreement six years before the filing of the initial complaint, the Absolute Plaintiffs' claim falls

17   outside of the four-year window prescribed by Section 31303.

18       The Absolute Plaintiffs argue that their claim is not time-barred because Harman's "conduct

19   throughout [the relevant period] constitutes a continuing violation of California franchise laws

20   through and including March 10, 2020." SAC ¶ 42. However, not only do the Absolute Plaintiffs fail

21   to provide specific factual allegations supporting this argument, but as the gravamen of the claim

22   rests on the failure to register, this argument is unavailing.[7]

23

24

25   _____

26   [7] The Absolute Plaintiffs, citing no case law, argue that each of the Agreement's yearly automatic renewals
     created a new violation. *See* Opp'n at 4. However, as previously discussed, because the intent behind the
     CFIL is to allow potential franchisees to make "an intelligent decision" regarding entering into a franchise
27   contract, it cannot reasonably be argued that each renewal was a new violation. CAL. CORP. CODE § 31001.
     An automatic renewal does not afford a franchisee with the ability to reevaluate the terms of the contract or
28   for the parties to renegotiate or amend the contract's terms at the time of renewal. Accordingly, an automatic
     renewal is outside of the realm of the circumstances that the CFIL was intended to address.

As the claim is time-barred, the Absolute Plaintiffs' first cause of action must be dismissed. Because further amendment would be futile, this claim is DISMISSED WITHOUT LEAVE TO AMEND.

**D. The Absolute Plaintiffs satisfy the Rule 9(b) heightened pleading standard.**

The Harman Defendants maintain that the Absolute Plaintiffs have not alleged a claim for fraud with particularity. Specifically, the Harman Defendants assert that the Absolute Plaintiffs fail to meet any of the Rule 9(b) requirements as they fail to "allege who made the allegedly fraudulent representations, what authority whoever made the allegedly fraudulent representations had to speak on behalf of Harman, to whom at Absolute the allegedly fraudulent representations were made, and when the allegedly fraudulent representations were made." Mot. at 14. The Absolute Plaintiffs, in response, contend that they have met all five requirements. *See* Opp'n at 10–11.

The elements of the California tort of "fraud" are: (1) "misrepresentation," which includes either a "false representation, concealment or nondisclosure"; (2) "knowledge of falsity," also referred to as "scienter"; (3) "intent to defraud," which includes an intent "to induce reliance"; (4) "justifiable reliance"; and (5) damages. *Lazar v. Superior Court*, 12 Cal.4th 631, 637 (1996) (citing CAL. CIV. CODE § 1710).

The Absolute Plaintiffs' fraud claim is based the Harman Defendants' alleged misrepresentation "to Absolute that it had the right to purchase products from Harman" and that Absolute "could sell Harman products under different trade names sold on various online retailers." SAC ¶¶ 53–54. In full, the Absolute Plaintiffs allege

> 53. Harman misrepresented to Absolute that it could sell Harman products under different trade names sold on various online retailers. In furtherance of this misrepresentation HARMN [sic] fulfilled the orders and shipped the products to ABSOLUTE and/or ABSOLUTE'S customers.
> 54. HARMAN misrepresented to ABSOLUTE that it had the right to purchase products from HARMAN. Specifically, HARMAN knew that ABSOLUTE was selling certain HARMAN products under different trade names on various online retailers. For many years HARMAN perpetrated this fraud and misrepresentation by allowing the orders to go fulfilled and shipping the products to ABSOLUTE'S customers. Suddenly, on or about March 10, 2020, without notice, HARMAN terminated ABSOLUTE'S dealership relationship and the AGREEMENT without any notice or an opportunity to cure.

55. HARMAN'S misrepresentations were material. Absolute would not have entered into the Agreement if it could not purchase Harman products under different trade names.

56. Harman intended to induce ABSOLUTE to rely on its misrepresentations.

57. Franchisor HARMAN specifically induced ABSOLUTE to enter the AGREEMENT and the franchise relationship by authorizing ABSOLUTE to sell HARMAN product online to customers, via the AGREEMENT. Thereafter, on March 10, 2020, HARMAN terminated ABSOLUTE'S franchise relationship and the AGREEMENT without any notice or an opportunity to cure.

SAC ¶¶ 53–57.

The Court finds that the Absolute Plaintiffs have pleaded sufficient facts showing *what* the fraud was, *how* it was accomplished, and *why* the Harman Defendants' statements are false by alleging that Harman fulfilled Absolute's orders made "under different trade names on various online retailers" for many years before spontaneously terminating the Agreement. SAC ¶ 55.

As such, the Court DENIES the Motion as to the third cause of action.

**E. The Absolute Plaintiffs' negligent misrepresentation claim is adequately pleaded.**

Both parties allege that negligent representation claims are subject to Rule 9(b)'s heightened pleading standard. *See* Mot. at 15; Opp'n at 11. Contrary to both parties' arguments, the Ninth Circuit has yet to decide whether Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation. However, many California district courts treat negligent misrepresentation as a subgenre of fraud and apply Rule 9(b).[8] Further, both parties apply the Rule 9(b) analysis to the negligent misrepresentation claim. *See* Mot. at 15; Opp'n at 11. Thus, the Court applies the Rule 9(b) standard here. The Absolute Plaintiffs specifically argue that "in the same way that [its] cause of action for fraud properly alleges with particularly the circumstances constituting fraud or mistake . . . Plaintiff['s] cause of action for Negligent Misrepresentation is properly alleged as well." Opp'n at 11.

"The elements of negligent misrepresentation are: (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation,

---

[8] *See, e.g.*, *Gilmore v. Wells Fargo Bank N.A.*, 75 F. Supp. 3d 1255, 1269–70 (N.D. Cal. 2014) (collecting cases).

19

1   and (5) resulting damage." *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th

2   226, 243 (2007).

3        As previously discussed, the Absolute Plaintiffs have pleaded sufficient facts to establish the

4   existence of fraud. Therefore, the two remaining questions under this cause of action are (1) whether

5   the Absolute Plaintiffs pleaded that they "actually relied on the misrepresentation," *id.*, and (2)

6   whether the Absolute Plaintiffs pleaded that the Harman Defendants intended to induce the Absolute

7   Plaintiffs into the Agreement.

8        First, as the Absolute Plaintiffs have met the "who, what, when, where, and how" Rule 9(b)

9   requirement, they have also successfully alleged that they would not have entered into the contract

10   with Harman absent the ability to sell Harman products on various online retailers. The Absolute

11   Plaintiffs allege

12       53. Harman misrepresented to Absolute that it could sell Harman products under
      different trade names sold on various online retailers. In furtherance of this
13   misrepresentation HARMN [sic] fulfilled the orders and shipped the products to
      ABSOLUTE and/or ABSOLUTE'S customers.
14       55. HARMAN'S misrepresentations were material. Absolute would not have entered
      into the Agreement if it could not purchase Harman products under different trade
15   names
          65. HARMAN indented [sic] to induce ABSOLUTE to rely on its misrepresentations.
16       66. Moreover, Franchisor HARMAN specifically induced ABSOLUTE to enter the
      AGREEMENT and the franchise relationship by authorizing ABSOLUTE to sell
17   HARMAN product online to customers, via the AGREEMENT. Thereafter, on March
      10, 2020, HARMAN terminated ABSOLUTE'S franchise relationship and the
18   AGREEMENT without any notice or an opportunity to cure.

19

20   SAC ¶¶ 53, 55, 65–66. "Actual reliance occurs when the defendant's misrepresentation is an

21   immediate cause of the plaintiff's conduct, altering his legal relations, and when, absent such

22   representation, the plaintiff would not, in all reasonable probability, have entered into the

23   transaction." *Cadlo*, 125 Cal. App. 4th at 519. Viewing the facts in the light most favorable to the

24   non-moving party, the Court finds that the Absolute Plaintiffs have adequately shown their

25   detrimental reliance on the Harman Defendants' representations. The Absolute Plaintiffs indicate

26   that they entered into the Agreement with the understanding that they would be able to sell Harman

27   products via various third-party websites and proceeded to do so. *See* Opp'n at 10–11; SAC ¶¶ 53,

28   65–66.

Second, because the SAC "states a claim for fraud against [the Harman Defendants] . . . it necessarily means" it also states a claim for negligent misrepresentation. *Apollo*, 158 Cal. App. 4th at 243. Accordingly, the Court DENIES the Motion as to the fourth cause of action.

**F. The breach of contract claim is adequately pleaded.**

The Harman Defendants maintain that the Absolute Plaintiffs' seventh cause of action for breach of contract claim is inadequately pleaded because the Harman Defendants legitimately terminated the Agreement due to the Absolute Plaintiffs' breach. Mot. at 17. Specifically, the Harman Defendants argue that termination was proper "because Absolute was selling HARMAN products using trade names and websites other than those authorized in the Agreement." *Id.* In response, the Absolute Plaintiffs argue that the Harman Defendants improperly modified the Agreement's terms because Harman had previously accepted and fulfilled Absolute's sales on the websites in question. Opp'n at 11–12.

To prevail on a breach of contract claim under California law, a plaintiff must establish: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). A valid contract exists if the parties to the contract are capable of contracting, both parties consent to the contract's terms, a lawful object is present, and sufficient consideration exists. *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999).

The Court finds that the Absolute Plaintiffs have demonstrated the existence of a valid contract. Here, Absolute and Harman are both corporations capable of contracting and both parties consented to the Agreement; and Absolute provided Harman with payments "in excess of $1000" in consideration. SAC ¶¶ 10, 28. Next, the Court considers whether the Absolute Plaintiffs have sufficiently pleaded a breach of this valid contract. Taking the factual allegations as true, the Court finds: (1) Absolute entered into a valid dealership agreement with Harman, *id.* ¶ 10; (2) Absolute "performed all conditions and obligations on its part to be performed" under contract, *id.* ¶ 88; (3) the Harman Defendants breached the contract by terminating the Agreement without good cause and without "proper notice or an opportunity to cure as required under the Agreement," *id.* ¶ 92; and (4)

as a result, the Absolute Plaintiffs have suffered damages. *Id.* ¶ 95. Thus, the Court finds that the Absolute Plaintiffs' breach of contract claim is adequately pleaded. Accordingly, the Court DENIES the Motion as to the seventh cause of action.

**G. The presence of an express contract renders the Absolute Plaintiffs' claim for breach of implied-in-fact contract improper.**

As discussed above, the Absolute Plaintiffs have pleaded sufficient facts indicating the presence of a valid express contract. As "it is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter," this claim is improper. *Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 44 Cal. App. 4th 194, 203 (Ct. App. 1996). As further amendment would be futile, the eighth cause of action is DISMISSED WITHOUT LEAVE TO AMEND.

**H. The Absolute Plaintiffs fail to plead sufficient facts to support breach of the implied covenant of good faith and fair dealing.**

The Harman Defendants contend that the Absolute Plaintiffs' ninth cause of action for breach of the implied covenant of good faith and fair dealing must be dismissed as New York law does not "recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Mot. at 18 (citing *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). However, as established above, the Court applies California law when analyzing the merits of the Absolute Plaintiffs' claims. The Absolute Plaintiffs argue that they have sufficiently pled this claim as it has alleged "both a contractual relationship alleged as well as 'benefit conferred by the contract.'" Opp'n at 14.

In California, the implied covenant of good faith and fair dealing is read into a contract "to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Racine & Laramie, Ltd. v. Dept. of Parks & Rec.*, 11 Cal. App. 4th 1026, 1031–32 (1992) (internal citations omitted). Accordingly, a "breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing." *Schwartz v. State Farm Fire and Cas. Co.*, 88 Cal. App. 4th 1329, 1339 (2001).

As discussed above, the Absolute Plaintiffs have sufficiently established the existence of a contractual relationship. However, the Absolute Plaintiffs have failed to plead that the Harman Defendants have interfered with the Absolute Plaintiffs' benefits under the contract. All the Absolute Plaintiffs provide in support of this claim is the allegation that the Harman Defendants "unfairly interred [sic] with PLAINTIFF ABSOLUTE'S right to receive the benefits of the contracts when it unfairly terminated them on March 10, 2020." SAC ¶¶ 107. The SAC does not describe how the Harman Defendants interfered with the Absolute Plaintiffs' benefits or which particular benefits were denied as a result of the Harman Defendants' actions. Even drawing all inferences in the light most favorable to the Absolute Plaintiffs, in the absence of more information, the allegations amount to no more than "legal conclusions." *Manzarek*, 519 F.3d at 1031; *Iqbal*, 556 U.S. at 678.

Accordingly, the ninth cause of action is DISMISSED WITH LEAVE TO AMEND.

**I.   The UCL claim is improper because the Absolute Plaintiffs are entitled to an adequate remedy at law.**

The Harman Defendants argue that the SAC fails to allege any facts to support the tenth cause of action for unfair business practice aside from "allegedly false representations." Mot. at 19. California Business and Professions Code § 17200 ("UCL") provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. CAL. BUS. & PROF. CODE § 17200. Each prong "is a separate and distinct basis for liability." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

The Absolute Plaintiffs contend that their UCL claim is adequately pleaded because they have alleged that "HARMAN falsely represented and allowed ABSOLUTE to sell HARMAN'S products under different trade names on various online retailers . . . until HARMAN abruptly terminated the AGREEMENT without notice." Mot. at 15; SAC ¶ 117. However, the Harman Defendants contend that the Absolute Plaintiffs' claim for violation of the UCL fails because (1) the claim is based on "allegedly false representations made by HARMAN"; (2) the claim is based upon a purported breach of contract; and (3) the Absolute Plaintiffs are improperly seeking monetary damages. Mot. at 19–20; Reply at 7.

The UCL provides only equitable remedies—specifically restitution and injunctive relief. *See Kor. Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003); *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 452 (2005). As statutory relief under the UCL is "subject to fundamental equitable principles, including inadequacy of the legal remedy," *Prudential Home Mortg. Co. v. Super. Ct.*, 66 Cal. App. 4th 1236, 1249 (1998), a plaintiff is only entitled to injunctive relief under the UCL if she is able to establish that there is no adequate remedy at law. *Knox v. Phoenix Leasing, Inc.*, 29 Cal. App. 4th 1357, 1368 (1994).

Here, the Absolute Plaintiffs appear to seek an injunction "prohibiting [the Harman Defendants'] illicit conduct." Prayer, SAC ¶ 4. However, as previously discussed, the Court finds that the Absolute Plaintiffs have an adequate remedy at law in the form of their breach of contract, fraud, and negligent misrepresentation claims. As such, and because further amendment would be futile, the tenth cause of action is DISMISSED WITHOUT LEAVE TO AMEND.[9]

### J. Razipour should be dismissed as a plaintiff from the fifth cause of action for violation of 42 U.S.C. § 1981, but should remain as plaintiff as to the sixth cause of action for violation of the Unruh Act.

The Court now turns to the Harman Defendants' arguments seeking to dismiss Razipour as a plaintiff from the fifth cause of action for violation of 42 U.S.C. § 1981 and the sixth cause of action for violation of the Unruh Act. The Harman Defendants do not seek to dismiss these two claims in their entirety; rather they seek to dismiss the claims as they relate to Razipour. *See* Mot. at 20. The Harman Defendants contend that these two claims—race discrimination in contracting pursuant to 42 U.S.C. § 1981 and violation of the Unruh Act—are improperly pleaded, and thus cannot support

---

[9] *See Durkee v. Ford Motor Co.*, No. C 14–0617 PJH, 2014 WL 4352184, at *3 (N.D. Cal. Sept. 2, 2014) ("Because the UCL provides for only equitable remedies, and plaintiffs have an adequate remedy at law for the alleged Song–Beverly Act violation, plaintiff's UCL claim must be dismissed."); *Gardner v. Safeco Ins. Co. of Am.*, No. 14–CV–02024–JCS, 2014 WL 2568895, at *7 (N.D. Cal. June 6, 2014) (dismissing UCL claim where plaintiffs' "claims for breach of contract and breach of the implied covenant of good faith and fair dealing may provide an adequate remedy [at law]"); *McAdam v. State Nat. Ins. Co.*, No. 12CV1333 BTM MDD, 2012 WL 4364655, at *3 (S.D. Cal. Sept. 24, 2012) (dismissing UCL claim with prejudice where plaintiff "has an adequate legal remedy in the form of his breach of contract claim.").

1   the inclusion of Razipour as a plaintiff. *See id.* The Court addresses the Harman Defendants'

2   arguments as to each cause of action in turn.

3      i.   Razipour does not qualify as a plaintiff for the purposes of 42 U.S.C. § 1981 because he is
          not a direct beneficiary of the Agreement.

4

5      The Harman Defendants  argue that Razipour should be dismissed as a plaintiff from the fifth

6   cause of action for race discrimination in contracting under 42 U.S.C. § 1981 because this claim is

7   based on "allegedly unlawful discriminatory termination of the HARMAN-Absolute Dealer

8   Agreement" of which Razipour is not a party. Mot. at 20. The Absolute Plaintiffs respond by

9   maintaining that as sole owner of Absolute, Razipour is the "direct beneficiary of any and all

10   benefits under the Agreement" and that the allegedly discriminatory conduct was specifically

11   directed towards Razipour. Opp'n at 16.

12      42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

13   have the same right in every State and Territory to make and enforce contracts, to sue, be parties,

14   give evidence, and to the full and equal benefit of all laws and proceedings for the security of

15   persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains,

16   penalties, taxes, licenses, and exactions of every kind, and to no other." Section 1981 applies to both

17   public and "purely private acts of racial discrimination." *Runyon v. McCrary*, 427 U.S. 160, 170

18   (1976); *see also* 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against

19   impairment by nongovernmental discrimination and impairment under color of State law.").

20      To state a prima facie case of discrimination under Section 1981, a plaintiff must "show that:

21   (1) [he] is a member of a protected class, (2) [he] attempted to contract for certain services, and (3)

22   [he] was denied the right to contract for those services." *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d

23   1138, 1145 (9th Cir. 2005) (citations omitted). Accordingly, the "plaintiff *himself* must have rights

24   under the contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)

25   (emphasis added).

26      Razipour alleges the following facts in support of his Section 1981 claim: that (1) he "heard

27   derogatory statements from HARMAN's representative Michael A. Schoen"; (2) that "the

28   AGREEMENT included a guarantee between HARMAN and RAZIPOUR obligating RAZIPOUR to

1   HARMAN"; (3) that upon termination of the Agreement, Schoen "told ABSOLUTE and

2   RAZIPOUR that he was happy to finally be able to terminate the AGREEMENT" and that he had

3   "wanted to do so for some time because 'all you . . .  Arabs and Iranians need to be terminated'"; and

4   (4) that "upon information and belief," Razipour's race and ethnicity were "substantial motivating

5   factors" for the contract's termination. SAC ¶¶ 73–76.

6        *Domino's Pizza, Inc. v. McDonald* is instructive. 546 U.S. 470 (2006). In that case, the

7   president of a corporation brought a claim against defendant Domino's Pizza, Inc., alleging that the

8   corporation had breached a contract with the plaintiff's company due to racial animus. *See id.* at

9   471–74. The plaintiff, citing to Section 1981's protection of the "right to make and enforce"

10  contracts, alleged that by breaching the contract, Domino's interfered with his right to enter contracts

11  on behalf of his principal. *Id.* However, the Supreme Court rejected the plaintiff's argument because

12  the facts of the case indicated that plaintiff entered the contract as *an agent* of his business and not

13  on his own behalf. *Id.* at 470. The Supreme Court held that while Section 1981 "offers relief when

14  racial discrimination blocks the creation of a contractual relationship," the provision protections only

15  apply when "plaintiff *himself* must have rights under the contractual relationship." *Id.* at 476

16  (emphasis added). Thus, the Court held that "[a]ny claim brought under § 1981 . . . must initially

17  identify an impaired 'contractual relationship,' under which the plaintiff has rights." *Id.* Further, the

18  Court, relying on fundamental tenets of agency law, held that an agent of a corporation cannot be

19  said to have under a contract or be determined to have been "exposed to . . . liability under the

20  corporation's contracts." *Id.* at 477.

21        The Harman Defendants direct the Court to the same conclusion, *see* Suppl. Br. at 3, arguing

22  that "Mr. Razipour is not a party to the Dealer Agreement and had no contractual rights of his own in

23  his individual capacity terminated or otherwise impaired," and that any alleged loss "is Absolute's

24  alone . . . ." *Id.* at 2. An examination of the Agreement supports this conclusion. Razipour fails to

25  indicate that he personally entered into a contract with the Harman Defendants. Indeed, the text of

26  the Agreement identifies "Absolute USA, Inc." as the Dealer while only identifying Razipour as the

27  signatory. *See* Dealer Agreement at 8. Because Razipour was, at best, only acting as Absolute's

28  agent, he failed to enter into a contract with Harman and is thus unable to claim that he was denied

the "right to make and enforce" the Agreement. *Domino's*, 546 U.S. at 478. As Razipour fails to provide any facts indicating that he personally had any rights under the Dealer Agreement, he has failed to state a claim. *See Domino's*, 546 U.S. at 476.

Further, in the SAC and again at the Hearing, Razipour directs the Court to the guarantee embedded in the Application for Open Account. FAC ¶¶ 73, 80. In full, the guarantee provides

> In consideration of HARMAN extending credit hereunder, if any, the undersigned jointly and severally, and unconditionally guarantee and promise to pay to the order of HARMAN, on demand, any and all indebtedness of the Applicant to HARMAN. This is a continuing guarantee, and the obligations created hereby are unaffected by any change in the terms of the original indebtedness between HARMAN and the above named Applicant save that of full payment.

Application for Open Account, ECF No. 23-3, Ex. A at 10 ("Guarantee").

Razipour appears to argue that the Guarantee—specifically, the language referring to the "undersigned" and the "Applicant"—indicates that Razipour personally entered into the Agreement and is thus able to recover under Section 1981. An examination of the Agreement and the Application for Open Account in which the Guarantee is embedded, however, belies a different conclusion. As the Harman Defendants state in the Supplemental Brief, the Agreement and Application for Open Account are two separate documents, meaning that the Guarantee does not make Razipour a party to the Agreement and he thus has "no contractual rights of his own in his individual capacity" under said agreement. Suppl. Br. at 2. Indeed, the two documents are separately titled, require separate signatures and dates, and have distinct terms and conditions. *Compare* Dealer Agreement *with* Application for Open Account. Moreover, the terms and conditions of the Application for Open Account explicitly state that "[i]n the event that this application is approved by HARMAN [and a Dealer Agreement is executed], the terms of the [Dealer Agreement] shall prevail in the event (and the extent) of any inconsistency between this application and the [Dealer Agreement]." Application for Open Account at 10. As such, when read in conjunction with the Agreement in which Razipour only appears as Absolute's agent and not on his own behalf, not only does the Guarantee not affect the Agreement, but the Guarantee does not establish Razipour as anything other than an agent of Absolute. Indeed, the Guarantee does not grant Razipour any rights under the Agreement.

Accordingly, the Court GRANTS the Motion to Dismiss as to Fifth Cause of Action. As Razipour is not party to the Agreement, and further amendment would be futile, he is DISMISSED as plaintiff WITHOUT LEAVE TO AMEND.

  ii. <u>As Razipour's Unruh Act claim is sufficiently pleaded, he should not be dismissed as plaintiff.</u>

  The Court next considers the Harman Defendants' argument that Razipour must be dismissed as a plaintiff from the sixth cause of action for violation of the Unruh Act, Cal. Civ. Code §§ 51, 52. The parties' arguments as to the sixth cause of action are identical to those for violation of the fifth cause of action.[10] Accordingly, the Court does not repeat them here.

  *1. <u>The SAC alleges sufficient facts to establish an Unruh Act claim as to Razipour.</u>*

  In relevant part, the Unruh Act provides:

> All persons within the jurisdiction of this state are free and equal, and no matter what their . . . race . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

CAL. CIV. CODE § 51(b).

  To establish a claim for racial discrimination under the Unruh Act, the defendant must be a business establishment. *Smith v. BP Lubricants USA Inc.*, 64 Cal. App. 5th 138, 154, (2021) ("The Unruh Act's overarching purpose is to create and preserve a nondiscriminatory environment in California business establishments by banishing or 'eradicating arbitrary, invidious discrimination by such establishments.'"). A plaintiff must further show: (1) he was denied full and equal services; (2) the plaintiff's race was a substantial motivating reason for the defendant's conduct; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm. *See* Jud. Council of Cal. Civil Jury Instructions, CACI No. 3060 (Unruh Civil Rights Act—Essential Factual Elements) (2021); *see also* CAL. CIV. CODE § 51(b). Intentional discrimination is required for violations of the Unruh Act. *Harris v. Capital Growth Invs. XIV*, 52

---

[10] This, however, is incorrect. The tenor of the parties' arguments appears to be founded on the misplaced understanding that claims brought pursuant to the Unruh Act, and those pursuant to Section 1981, have overlapping requirements. And while this may be true in certain, limited circumstances—namely, when alleged violation of the Unruh Act is founded upon a contract—the SAC does not allege such facts here.

Cal. 3d 1142, 1149 (1991), *superseded by statute on other grounds as stated in Munson v. Del Taco, Inc.*, 46 Cal.4th 661, 664–65 (2009).

      a. <u>Harman is a business establishment under the meaning of the Unruh Act.</u>

"The Unruh Act only applies to business establishments that are generally open to the public, and mandates that those establishments serve all persons without arbitrary discrimination." *Smith v. BP Lubricants USA Inc.*, 64 Cal. App. 5th 138, 149 (2021) (internal citations and quotation marks omitted).

The legislative intent of the Unruh Act is to provide broad protection against arbitrary discrimination, the term "business establishment" is intended to be "used in the broadest sense possible." *O'Connor v. Village Green Owners Assn*., 33 Cal. 3d 790, 795 (1983). While neither party explicitly presents arguments establishing whether Harman is a business establishment, the SAC indicates that Harman is a corporation that "do[es] business" in California. With the Unruh Act's broad coverage in mind, and taking all allegations in the SAC as true—as this Court must on a 12(b)(6) motion to dismiss—the Court finds that Harman qualifies as a business under the meaning of the Unruh Act.

      b. <u>Razipour has established that he was denied full and equal services.</u>

The SAC sufficiently alleges that Razipour, and not just Absolute, was denied full and equal services, thereby meeting the requirements of the first factor. The SAC states that Absolute and Razipour "asked for accommodations that are ordinarily granted to all dealers and DEFENDANTS refused." SAC ¶ 83. Additionally, as stated below, Razipour has sufficiently pleaded that race was likely a motivating factor for the Harman Defendants' conduct. As "hold[ing] that a business establishment cannot face liability under the Unruh Act for its racially harassing conduct toward its customers would thwart the Unruh Act's broad remedial purpose and overarching goal of deterring discriminatory practices by businesses," the Court finds that Razipour has sufficiently met this standard. *Smith*, 64 Cal. App. 5th at 154.

/ / /

/ / /

   c.   Razipour has established that his race was a substantial motivating reason for the
        Harman Defendants' conduct.

Under the second factor, while a plaintiff need not prove that he belongs to one of the classes protected by the Unruh Act, he "must prove that the defendant *perceived* that plaintiff belonged to such a class, or *perceived that plaintiff associated with others who belonged*." Calif. Fair Housing and Public Accommodations § 15.10. Here, SAC alleges that the Harman Defendants' "substantial motivating factor" in terminating the Agreement is that Razipour is "from the [M]iddle [E]ast, specifically from Iran." SAC ¶ 82. The SAC also contends that it is implied that Schoen wanted to terminate the Agreement because he stated that "all you . . . Arabs and Iranians need to be terminated." *Id.* ¶ 81. Thus, looking at the facts in the light most favorable to Razipour, the Court finds that the Harman Defendants clearly perceived that Razipour is of Iranian or Arab descent or that he associates with persons of Iranian or Arab descent. Thus, the Court finds that the second factor has been met.

   d.   Razipour has established that he suffered harm and that the Harman Defendants'
        conduct caused his harm.

The third and fourth elements of an Unruh Act claim require that Razipour show that he was harmed and that the Harman Defendants' conduct was a substantial factor in causing his harm.

Razipour argues that Schoen's comment that "all you . . . Arabs and Iranians need to be terminated" supports the Unruh Act claim. Opp'n at 16. Indeed, precedent shows that Schoen's comments indicate that Razipour was treated "differently—and unequally—because of his race . . . which if proven to be true, would amount to intentional discrimination made by a business establishment in the course of furnishing goods, services or facilities to its clients, patrons or customers." *Smith v. BP Lubricants USA Inc.*, 64 Cal. App. 5th 138, 151 (2021) (internal quotations marks and citations omitted). As Schoen is Harman's employee, viewing the facts in the light most favorable to Razipour, the third and fourth elements are met.

Thus, the Court DENIES the request to dismiss Razipour as a plaintiff as to the sixth cause of action.

**K. The Harman Defendants' Requests to Deny Leave to Amend**

The Court has dismissed several of the Absolute Plaintiffs' claims with leave to amend. The Harman Defendants request that the Court deny further leave to amend because the Court has

previously dismissed "all of Razipour's claims and nine of Absolute's claims," thus rendering

further amendment futile. Mot. at 21. However, as highlighted *supra* note 4, the Absolute Plaintiffs'

First Amended Complaint was dismissed for failure to file a timely opposition, not on the merits of

the claims. Moreover, as established in the foregoing discussion, the Court does not find amendment

of many of the instant claims futile. As precedent dictates that leave to amend is to be granted

liberally, the Court finds amendment proper for all claims dismissed with leave to do so. *See, e.g.*,

*Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (listing "futility" among

reasons to deny leave to amend). Thus, the Absolute Plaintiffs are ORDERED to file a Third

Amended Complaint within thirty (30) days of this Order if they still desire to pursue any of the

claims being dismissed with leave to amend.

## CONCLUSION

For the reasons stated above, the Court ORDERS as follows:

1) The Absolute Plaintiffs' Request for Judicial Notice is GRANTED;

2) The Harman Defendants' Motion to Dismiss is GRANTED WITH LEAVE TO AMEND as to the Absolute Plaintiffs' first, fourth, and ninth causes of action;

3) The Harman Defendants' Motion to Dismiss is GRANTED WITHOUT LEAVE TO AMEND as to the Absolute Plaintiffs' second, eighth, and tenth causes of action;

4) The Harman Defendants' Request to Dismiss Razipour as a plaintiff is GRANTED as to the fifth cause of action;

5) The Harman Defendants' Request to Dismiss Razipour as a plaintiff is DENIED as to the sixth cause of action.

**IT IS SO ORDERED.**

Dated: February 14, 2023

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge